IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-CV-

TIMOTHY SPIKES; and
SYLVIA MONTOYA

      Plaintiffs,

v.

CAR TOYS, INC., a Washington corporation registered to do business in Colorado;
GEO SECURE SERVICES, LLC, a Florida limited liability company registered to do business in Colorado;
CITY OF AURORA, a municipality;
CITY AND COUNTY OF DENVER;
JEFFERY WHEELIS, in his individual and official capacities;
ANDREW MERINO, in his individual and official capacities;
ERIC DORTCH, in his individual and official capacities; and
PETER PONICH, in his individual and official capacities;

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

    Plaintiffs Timothy Spikes ("Spikes") and Sylvia Montoya ("Montoya"), state their Complaint, as follows:

### JURISDICTION AND VENUE

    1.    This action primarily arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.  42 U.S.C. § 1988 supports Plaintiffs' claims for attorney fees and costs.  This Court has jurisdiction over all claims arising out of federal law pursuant to 28 U.S.C. § 1331.

    2.    Plaintiffs also bring a claim under state law.  That claim is so related to Plaintiffs' federal claims, it forms part of the same case or controversy under Article III of

the Constitution.  Accordingly, this Court has supplemental jurisdiction over Plaintiffs'

state law claim pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. §

1391(b)(2).  All events alleged herein occurred within the State of Colorado.

## PARTIES

4.      At all relevant times, Plaintiffs were citizens of the United States of America,

residing in Colorado.

5.      At all relevant times, Defendant Car Toys, Inc. ("Car Toys") was a

Washington corporation doing business in Colorado.

6.      At all relevant times, Defendant Geo Secure Services ("Geo") was a Florida

limited liability company doing business in Colorado.  Geo operates Aurora ICE

Processing facility.  It derives its authority to do so from the State of Colorado.

7.      At all relevant times, Defendant the City and County of Denver ("Denver")

was a Colorado municipal corporation.

8.      At all relevant times, Defendant the City of Aurora ("Aurora") was a Colorado

municipal corporation.

9.      At all relevant times, Defendant Jeffery Wheelis ("Wheelis") was an

investigator employed by the Aurora Police Department.

10.      At all relevant times, Defendant Andrew Merino ("Merino") was an

investigator employed by the Aurora Police Department.

11.      At all relevant times, Defendant Eric Dortch ("Dortch") was an investigator

employed by the Aurora Police Department.

12.     At all relevant times, Defendant Peter Ponich ("Ponich") was a patrol officer employed by the Aurora Police Department.

## GENERAL ALLEGATIONS

### The Aurora Police Department Stops Spikes on March 6, 2019

13.     Historically, a relatively high level of narcotics transactions take place in the neighborhood surrounding the Summit View Inn motel, located at 11800 East Colfax Avenue, Aurora, Colorado.

14.     On March 6, 2019, Wheelis and Merino conducted visual surveillance of the Summit View Inn motel.

15.     During their surveillance that day, Wheelis and Merino observed Spikes pull into the motel parking lot in a white 2019 Dodge Charger (the "White Vehicle"), speak to another unknown man in the parking lot, and walk into room #205.

16.     Wheelis and Merino did not see Spikes again until he exited room #205 and drove out of the motel parking lot.

17.     Wheelis and Merino reported their observations to Ponich, who was assigned to assist the narcotics unit and patrolling that day.

18.     Shortly thereafter, at 12:17 p.m., Ponich pulled Spikes over, on suspicion of illegal window tinting.

19.     Spikes provided Ponich his driver's license, registration, and proof of insurance.

20.     The registration listed the White Vehicle's owner as Montoya.

21.     The registration listed Montoya's residential address as 2564 South Yates Street, Denver, Colorado 80219.

22.     Ponich asked Spikes to exit the White Vehicle and wait for another officer to bring a window-tint meter.

23.     Spikes then admitted to Ponich that his tint was too dark and requested that Ponich issue him a citation and that he be allowed to leave the scene.

24.     Upon information and belief, Ponich had a window-tint meter in his possession at the time and requested Spikes to wait as a pretense to allow time for another officer to bring a K-9 unit member to search the Vehicle.

25.     Officer Ponich conducted a pat-down examination of Spikes and found no weapons or contraband.

26.     Approximately 11 minutes later, at 12:33 p.m., Aurora Police Department Sergeant Carelock arrived and tested the window's light transmission.

27.     The front passenger window transmitted only 5% of external light.  State law allows no less than 27% light transmission.

28.     At a disputed time after Sergeant Carelock tested the window's light transmission, Dortch deployed a K-9 patrol dog, "Puck" to detect contraband in the White Vehicle.

29.     Spikes repeatedly indicated he did not consent to a search of the White Vehicle.

30.     In a report detailing the incident, Dortch stated that Puck alerted officers to the presence of a controlled substance near the front passenger side of the White Vehicle. However, non-party expert testimony demonstrates Dortch falsified this report; Puck did not detect contraband in the White Vehicle.

31.     Dortch could not open the locked glove compartment in the front passenger's side, and he impounded the White Vehicle to apply for a search warrant.

32.     At approximately 12:58 p.m., Aurora Police Department Officer Kenneth Forrest completed an inventory search and vehicle report form.  Extreme Towing then towed the White Vehicle to the Aurora Police Department's secure evidence bay.

33.     At approximately 1:04 p.m., Ponich issued Spikes a municipal traffic citation, alleging he violated Aurora Municipal Traffic Code 277(1)(a), "Unlawful Window Tinting."  Ponich then released Spikes.

34.     At the time the White Vehicle was impounded, it was equipped with a Momento M5 audio and video recording device.  The Momento M5 includes motion sensors that trigger audio and video recording while the vehicle is parked.  It captures and stores those recordings on an interior memory card.

35.     The Momento M5 camera was recording when Spikes vehicle was parked at the Summit View Motel and this recording was directly contrary to the statement Wheelis put into the affidavit for search and affidavit for arrest warrants.

36.     The White Vehicle's Momento M5 continued recording after the Vehicle arrived at the Aurora Police Department's evidence bay on March 6, 2019.

37.     The White Vehicle's Momento M5 captured video and audio footage of Wheelis and Merino searching the Vehicle in the evidence bay on March 6, 2019—before obtaining a search warrant to do so.

38.     Wheelis did not author and submit an application for a search warrant until March 7, 2019.

39.     The Arapahoe County Court authorized a search warrant on March 11, 2019.

40.     On March 12, 2019, Wheelis accessed the White Vehicle's glove compartment and discovered a semi-automatic pistol, a digital scale, and illegal controlled substances (cocaine and methamphetamine).

41.     Wheelis also collected the Momento M5's memory card as evidence directly after the illegal search upon discovering that their illegal search was being recorded.  He and Merino later destroyed multiple files from the memory card.

42.     On March 27, 2019, Wheelis authored and submitted an application for an arrest warrant for Spikes based on the evidence he found in the White Vehicle.  As support for his application, Wheelis falsely characterized the foot traffic outside the Summit View Inn motel.  The application also included Ponich's false statements that he was compelled to wait for another officer to bring a tint meter after he initially pulled Spikes over, as he subseqeutly admitted that he was ordered to hold the vehicle for the K-9 search.  It also included Dortch's false report that Puck identified contraband in the White Vehicle.

43.     The Arapahoe County District Court issued the requested warrant the following day, on March 28, 2019.

## The Denver Police Department Arrests Spikes

44.     Denver Police Department officers arrested Spikes on his Arapahoe County arrest warrant on March 28, 2019, while he was driving a 2018 black Dodge Charger (the "Black Vehicle").

45.     Spikes was stopped in Jefferson county and prior to this point at no time had he entered Denver county.

46.     Denver Police Department officers then took Spikes into custody and took him to the Denver Police Department station despite having no jurisdiction in the case.

47.     Denver Police Department Sergeant Foster authorized his subordinates to strip search Spikes which would not have been authorized in either Arapahoe County or Jefferson County had a strip search been requested.  That search revealed heroin on Spikes's person.

48.     Denver Police Department officers placed Spikes on an investigative hold in Denver County's custody, pending charges.  He was subsequently charged with multiple felony drug offenses.

49.     When Denver Police Department officers arrested Spikes on March 28, 2019, they searched the Black Vehicle and found three thousand dollars ($3,000) and an empty clear baggie therein.

50.     Denver Police Department officers had the Black Vehicle towed to an impound lot.

**The Denver Police Department Surveils Spikes's Apartment and Subsequently Arrests Both Spikes and Montoya**

51.     Sometime in late February 2019, Denver Police Department officers followed Spikes to an apartment located at 3966 South Wadsworth Boulevard, Littleton, Colorado 80235 ("Wadsworth Apartment").

52.     Sometime in early March 2019, the Denver Police Department installed a pole camera to surveil the Wadsworth Apartment.

53.     The surveillance video from this pole camera was destroyed; only certain still photographs remain discoverable.

54.     Those photographs demonstrate that Montoya visited the Wadsworth Apartment on two occasions in March 2019.

55.     On March 28, 2019, Denver Police Department officers requested and received a warrant to search the Wadsworth Apartment.

56.     While searching the Wadsworth Apartment, Denver Police Department officers found and retained $1,342.00, illegal narcotics (crack cocaine, heroin, and methamphetamine), four digital scales, and drug paraphernalia.

57.     On May 23, 2019, both Plaintiffs were indicted and arrested in connection with case no. 19-cr-264-WJM in the District of Colorado.

## FIRST CLAIM FOR RELIEF
### (1983 Fourth and Fourteenth Amendment Violation – Unlawful Search, Against Defendants Wheelis, Merino, Ponich, and Dortch—in their official and individual capacities)

58.     Plaintiffs incorporate all other paragraphs of this complaint as though fully set forth herein.

59.     At all relevant times, Defendants Wheelis, Merino, Ponich, and Dortch acted under color of state law.

60.     Plaintiffs have a legitimate expectation of privacy in their property being free from unreasonable government searches.

61.     On March 6, 2019, no probable cause supported Ponich's request that a K-9 unit dog search the White Vehicle or that Ponich has a right to detain Spikes vehicle for said search.

62.     On March 6, 2019, no probable cause supported Dortch's conduct facilitating Puck's search of the White Vehicle.

63.     Further, because Puck did not detect contraband in the White Vehicle, Dortch had no authority to impound the White Vehicle and apply for a search warrant.

64.     Defendants Wheelis and Merino had no authority to search the White Vehicle after it was impounded, and an inventory search had been completed on March 6, 2019 and before receiving a court-issued warrant.

65.     Ponich, Dortch, Wheelis, and Merino, while acting under color of state law, intentionally deprived Plaintiffs of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including their right to freedom from unlawful searches as guaranteed by the Fourth and Fourteenth Amendments thereto.

66.     No legally recognizable exigent circumstances or other legal justification existed which would have justified or permitted Ponich's, Dortch's, Wheelis's, and/or Merino's conduct.

67.     Ponich's, Dortch's, Wheelis's and Merino's actions were objectively unreasonable in light of the circumstances.

68.     Ponich, Dortch, Wheelis and Merino engaged in an unlawful search of the White Vehicle intentionally, willfully, and wantonly.

69.     As a legal and proximate cause of Ponich's, Dortch's, Wheelis's and Merino's actions, Plaintiffs have suffered and continue to suffer humiliation, emotional distress, loss of enjoyment of life, and other significant injuries, damages, and losses.

## <u>SECOND CLAIM FOR RELIEF</u>
**(1983 Fourth and Fourteenth Amendment Violation – Unlawful Seizure, Against Defendants Ponich, Dortch, and Wheelis—in their official and individual capacities)**

70.     Plaintiffs incorporate all other paragraphs of this complaint as though fully set forth herein.

71.     At all relevant times, Defendants Wheelis, Ponich, and Dortch acted under color of state law.

72.     On March 6, 2019, Ponich did not have reasonable suspicion to expand the scope of Spikes's detention into a narcotics investigation by requesting a K-9 search of the White Vehicle and waiting for it to occur.

73.     On March 6, 2019, Dortch did not have reasonable suspicion to expand the scope of Spikes's detention during the traffic stop into a narcotics investigation by facilitating a K-9 search of the White Vehicle.

74.     In his report of the incident, Dortch misrepresented Puck's conduct during his search of the White Vehicle.

75.     Wheelis and Merino illegally destroyed multiple evidence files on the Momento M5's memory card.

76.     In his application for a warrant to arrest Spikes, Wheelis mischaracterized foot traffic at the Summit View Inn motel.  He also included Ponich's false statement that he was compelled to make Spikes wait for another office to bring a tint meter to the scene of the traffic stop.  Wheelis's application also included Dortch's false statement that Puck detected contraband in the White Vehicle.  These false statements all led to Spikes's and Montoya's arrests and unlawful detention.

77.     Ponich, Dortch, and Wheelis while acting under color of state law, intentionally deprived Plaintiffs of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including their right to freedom from unlawful seizures as guaranteed by the Fourth and Fourteenth Amendments thereto.

78.     No legally recognizable exigent circumstances or other legal justification existed which would have justified or permitted Ponich's, Dortch's, and/or Wheelis's conduct.

79.     Ponich's, Dortch's, and Wheelis's actions were objectively unreasonable in light of the circumstances.

80.     Ponich and Dortch unlawfully seized the White Vehicle intentionally, willfully, and wantonly.

81.     Ponich unlawfully seized Spikes's person intentionally, willfully, and wantonly.

82.     Wheelis caused the unlawful seizure of Plaintiffs' persons intentionally, willfully, and wantonly.

83.     As a legal and proximate cause of Ponich's, Dortch's, and Wheelis's actions, Plaintiffs have suffered and continue to suffer humiliation, emotional distress, loss of enjoyment of life, and other significant injuries, damages, and losses.

### **THIRD CLAIM FOR RELIEF**
**(1983 Violation – Constitutional Failure to Train and/or Supervise, Against Defendants the City and County of Denver and the City of Aurora)**

84.     Plaintiffs incorporate all other paragraphs of this complaint as though fully set forth herein.

85.     Denver was at all relevant times a policymaker for the Denver Police Department and established policies, procedures, customs, and/or practices for the Denver Police Department.

86.     Denver developed and maintained law enforcement-related policies, procedures, customs, and/or practices exhibiting or resulting in deliberate indifference to the Fourth and Fourteenth Amendment protected constitutional rights of persons in the City and County of Denver, which proximately caused the violation of Plaintiffs' constitutional rights.

87.     Denver failed to properly train and supervise its employees with regard to preservation of evidence and unlawful searches and seizures.

88.     In light of the duties and responsibilities of those law enforcement officers that participate in providing safety and security for citizens and arrestees, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional rights such as those described herein, that Denver is liable for its failure to train and to appropriately supervise officers of the Denver Police Department.

89.     The inadequate training and supervision provided by Denver resulted from a conscious or deliberate choice to follow a court of action from among various alternatives available to Denver.

90.     Denver has a duty to protect the constitutional rights of the members of the public from violation of those rights by members of its police department.

91.     Denver knew, or should have known, that individuals (including Plaintiffs) could suffer harmful consequences by Denver's failure to properly train and supervise its

12

employees. Denver could have and should have pursued reasonable methods for training and supervising its employees but failed to do so.

92. Denver's policies, customs, or practices related to its failure to train and supervise its employees proximately caused the violation of Plaintiffs' constitutional rights, which caused Plaintiffs' injuries and damages.

93. Aurora was at all relevant times a policymaker for the Aurora Police Department and established policies, procedures, customs, and/or practices for the Aurora Police Department.

94. Aurora developed and maintained law enforcement-related policies, procedures, customs, and/or practices exhibiting or resulting in deliberate indifference to the Fourth and Fourteenth Amendment protected constitutional rights of persons in the City of Aurora, which proximately caused the violation of Plaintiffs' constitutional rights.

95. Aurora failed to properly train and supervise its employees with regard to preservation of evidence and unlawful searches and seizures.

96. In light of the duties and responsibilities of those law enforcement officers that participate in providing safety and security for citizens and arrestees, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional rights such as those described herein, that Aurora is liable for its failure to train and to appropriately supervise officers of the Aurora Police Department.

97. The inadequate training and supervision provided by Aurora resulted from a conscious or deliberate choice to follow a court of action from among various alternatives available to Aurora.

98.     Aurora has a duty to protect the constitutional rights of the members of the public from violation of those rights by members of its police department.

99.     Aurora knew, or should have known, that individuals (including Plaintiffs) could suffer harmful consequences by Aurora's failure to properly train and supervise its employees.  Aurora could have and should have pursued reasonable methods for training and supervising its employees but failed to do so.

100.    Aurora's policies, customs, or practices related to its failure to train and supervise its employees proximately caused the violation of Plaintiffs' constitutional rights, which caused Plaintiffs' injuries and damages.

## FOURTH CLAIM FOR RELIEF
### (Negligence – Plaintiff Spikes Against Defendant Car Toys)

101.    Plaintiffs incorporate all other paragraphs of this complaint as though fully set forth herein.

102.    On May 29th, 2019, Car Toys was in possession and control of Spikes's car (the Black Vehicle) and had all duties of a bailee vis-à-vis Spike, including the duty to exercise reasonable care for the Black Vehicle's safekeeping.

103.    On May 29th, 2019, Car Toys breached that duty by turning over custody and control of the Black Vehicle to law enforcement, without a warrant supporting such seizure.

104.    As a direct and proximate cause of Car Toys's breach of its duty, Spikes has been damaged in an amount to be determined at trial.

14

**FIFTH CLAIM FOR RELIEF**
**(1983 Fourth and Fourteenth Amendment Violation – Unlawful Search and Seizure, Plaintiff Spikes Against Defendant Geo)**

105.   Plaintiffs incorporate all other paragraphs of this complaint as though fully set forth herein.

106.   At all relevant times, Defendant Geo acted under color of state law in connection with its operation of Aurora Ice Processing Center.

107.   While in custody at Aurora Ice Processing Center, Spikes had a legitimate expectation that phone calls between himself and his attorney would remain private.

108.   When Spikes spoke with this attorney on the phone while incarcerated at Aurora Ice Processing Center, he did not know Geo was recording those phone calls.

109.   Spikes did not authorize Geo to record his phone calls with his attorney.

110.   Without Spikes's authorization, Geo turned those recordings over to law enforcement.

111.   While acting under color of state law, Geo intentionally deprived Spikes of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including his right to freedom from unlawful searches and seizures as guaranteed by the Fourth and Fourteenth Amendments thereto.

112.   No legally recognizable exigent circumstances or other legal justification existed which would have justified or permitted Geo's conduct.

113.   Geo unlawfully searched and seized Spikes's privileged communications intentionally, willfully, and wantonly.

114.   As a legal and proximate result of Geo's actions, Spikes has suffered and continues to suffer emotional distress and other significant injuries, damages, and losses.

### SIXTH CLAIM FOR RELIEF
### (1983 Fourth and Fourteenth Amendment Violation – Plaintiff Montoya Against Defendant Denver)

115.   Plaintiffs incorporate all other paragraphs of this complaint as though fully set forth herein.

116.   At all relevant times, Montoya had a property interest in her position as a Deputy Sheriff with the Denver Sheriff Department.

117.   On August 23, 2019, Denver terminated Montoya's employment without cause.

118.   In so doing, Defendant Denver, under color of state law, intentionally engaged in illegal conduct which deprived Montoya of her property interest in her employment, secured by the 4th and 14th Amendments to the United States Constitution.

119.   In terminating Montoya without cause, Denver acted intentionally, willfully, and wantonly.

120.   No legally recognizable exigent circumstances or other legal justification existed which would have justified or permitted Denver's conduct.

121.   As a legal and proximate result of Denver's actions, Spikes has suffered and continues to suffer significant injuries, damages, and losses, including economic losses, emotional distress, and anxiety.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allows by law and equity, including, but not limited to:

a.   Actual economic damages as established at trial;

b.      Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty and privacy, loss of a sense of security and individual dignity, and other non-pecuniary losses;

c.      Punitive damages for all claims as allowed by law in an amount to be determined at trial;

d.      Pre- and post-judgment interest at the highest lawful rate;

e.      Attorney fees and costs; and

f.      Such further relief as justice requires.

## **REQUEST FOR TRIAL BY JURY**

Plaintiffs demand a jury on all issues so triable.

DATED this 6th day of March 2021.

Respectfully submitted,

*s/ Benjamin Hartford*
Benjamin Hartford Esq.
The Law Office of Benjamin Hartford LLC
650 S. Cherry St. Suite 1225
Glendale, CO 80246

*s/Jill M. Jackson, Esq.*
Law Office of Jill M. Jackson LLC.
650 S. Cherry Street, Suite 1225
Glendale, CO 80246